ENVIRONMENTAL COUNCIL OF
SACRAMENTO, Plaintiff,

v.

Rodney SLATER, et al., Defendants.

No. Civ.S–00–409 LKK/DAD.

United States District Court,
E.D. California.

Nov. 6, 2000.

Deborah S. Reames, San Francisco, CA, Joseph J. Brecher, Brecher and Volker, Oakland, CA, for Plaintiff.

Norman L. Rave, Jr., U.S. Department of Justice, Environment and Natural Resources Division, Washington, DC, Maxine

Fay Ferguson, Department of Transportation, Sacramento, CA, John Thomas Kennedy, III, Nossaman Guthner Knox and Elliott, Stanley W. Kronick, Daniel J. O'Hanlon, Kronick Moskovitz Tiedemann and Girard, Sacramento, CA, David M. Friedland, Gus B. Bauman, David M. Williamson, pro hac vice, Beveridge and Diamond, Washington, DC, for Defendants.

## ORDER

KARLTON, Senior District Judge.

Plaintiffs Environmental Council of Sacramento, Sierra Club, and "No–Way L.A." Coalition brought suit to challenge a Clean Air Act conformity determination made by the Sacramento Area Council of Governments ("SACOG") and approved by the United States Department of Transportation ("DOT"), through the Federal Highway Administration ("FHWA") and Federal Transit Administration ("FTA") and by the California Department of Transportation ("Caltrans"). Defendants moved to dismiss the plaintiffs' complaint in part and plaintiffs moved for a preliminary injunction and for summary judgment.[1] I address these motions based on the papers and pleadings filed herein and after oral argument.[2]

## I.

## THE REGULATORY SCHEME

Because this case lies at the intersection of federal highway aid programs and the Clean Air Act, I begin with a review of the applicable legislative schemes and their interrelation.

### A. FEDERAL HIGHWAY AID PROGRAMS

Chapter 1 of Title 23 of the United States Code establishes comprehensive programs to provide federal funding and financial assistance to states for regional and local highway projects. See 23 U.S.C. § 101 et seq. Section 134 of Title 23 requires all urban areas with a population over 50,000 to have a continuous, cooperative, and comprehensive transportation planning process to be carried out by a metropolitan planning organization ("MPO"). Each MPO must prepare a long-range transportation plan, (metropolitan transit plan or "MTP") encompassing at least 20 years, to identify regional transportation needs, develop an integrated transportation system, and assess the capital investments necessary to maintain or construct existing and future roadways or other transit facilities. See 23 U.S.C. § 134(g). The MPO also must develop a more specific transportation improvement program (metropolitan transit improvement program or "MTIP") which lists projects to be carried out over a three-year period and is updated at least every two years. See 23 U.S.C. § 134(h).

### B. THE CLEAN AIR ACT

The Clean Air Act ("CAA"), enacted in 1970 and amended in 1977 and 1990, establishes a joint state and federal program to address the nation's air pollution. See 42 U.S.C. §§ 7401 et seq. At the heart of the program are the national ambient air quality standards ("NAAQS"), which are promulgated by the Environmental Protection Agency ("EPA"). See 42 U.S.C. § 7409. The CAA requires the EPA to identify air

---

1. The Advocates for Safe and Efficient Transportation ("ASET") also moved to intervene as defendants. The parties stipulated to ASET's intervention and its motion was withdrawn.

2. While the court had these matters under submission, the parties cross-moved to augment the administrative record and submitted that without oral argument.

pollutants that endanger the public health and welfare and to formulate NAAQS that specify the maximum permissible concentrations of those pollutants in the ambient air. *See* 42 U.S.C. §§ 7408–09. The EPA has promulgated NAAQS for various pollutants, including ozone. *See* 40 C.F.R. Part 50.

The CAA places primary responsibility for achieving the NAAQS on the states. *See* 42 U.S.C. § 7407(a). Each state must submit for approval to the EPA a state implementation plan ("SIP") that specifies emission limitations and other control measures necessary for the attainment, maintenance, and enforcement of the NAAQS in each air quality control region within the state. *See* 42 U.S.C. § 7410(a)(1) and (2). Air quality control regions are designated as either "attainment" or "nonattainment" areas, depending upon whether they meet the NAAQS for a particular pollutant. *See* 42 U.S.C. § 7407(d). The Sacramento area is a severe nonattainment area for ozone, *see* 40 C.F.R. § 81.305, and thus NAAQS attainment necessarily entails the reduction of ozone emissions. *See* 42 U.S.C. § 7410(a)(2) ("Each implementation plan shall ... include ... schedules and timetables for compliance"). The statutory deadline for Sacramento to attain the NAAQS is currently set at November 15, 2005. *See* 42 U.S.C. § 7511(a)(1).

The Clean Air Act requires coordination between state air pollution control plans and federally-funded transportation plans developed pursuant to the Federal–Aid Highway Act, 23 U.S.C. §§ 101–160. Under the Clean Air Act, transportation projects may not be approved by local transportation planning organizations or funded by the DOT unless the projects are included in a MTP and MTIP that "conform" to applicable state air quality standards. *See* 42 U.S.C. § 7506(c)(1). This conformity requirement is designed to ensure that federally-funded transportation projects comply with the applicable air quality standards.

Section 176(c) of the Clean Air Act coordinates air quality control and transportation planning through a process known as the conformity determination. *See* 42 U.S.C. § 7501 *et seq.* The EPA, with the concurrence of DOT, promulgated regulations to establish procedures for implementing the conformity requirement which are codified at 40 C.F.R. Part 93 Subpart A. In nonattainment areas, the metropolitan planning organization must submit its MTP and MTIP to the FHWA and the FTA, which then determine whether the plan and program "conform" to the applicable SIP. *See* 42 U.S.C. § 7506(c)(2); 23 C.F.R. §§ 450.322(d), 450.330(b).[3] To find conformity, the FHWA and FTA must determine that the emissions expected from implementation of the MTP and/or MTIP are consistent with the emissions budgets set in the state implementation plan, and that the MTP and/or MTIP will not cause or contribute to a new violation of the NAAQS, exacerbate any existing violations of the NAAQS, or delay attainment of the NAAQS. *See* 42 U.S.C. §§ 7506(c)(2)(A) and (c)(1)(B). The Clean Air Act prohibits the DOT from approving, accepting, or funding any MTP, MTIP, or project that

**3.** 42 U.S.C. § 7506(c)(1) defines conformity to an implementation plan to mean:

(A) conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards and achieving expeditious attainment of such standards; and

(B) that such activities will not—

(i) cause or contribute to any new violation of any standard in any area;

(ii) increase the frequency or severity of any existing violation of any standard in any area; or

(iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.

does not conform to the relevant state implementation plan. *See* 42 U.S.C. §§ 7506(c)(1) and (2). The CAA also provides that the MPO must make its own conformity determination. *See* 42 U.S.C. §§ 7506(c)(1), (2)(A).[4]

Because Sacramento is a severe non-attainment area for ozone, *see* 40 C.F.R. § 81.305, it is subject to the CAA conformity requirements. *See* 42 U.S.C. § 7506(c)(1) and (2). The SACOG is the entity responsible for developing the metropolitan transportation plan (MTP) and metropolitan transit improvement program (MTIP). In July 1999, SACOG adopted a new plan and amendments to the existing MTIP for the Sacramento metropolitan area and submitted the plan and MTIP amendments to the DOT for a conformity determination. By letter dated July 28, 1999, the DOT determined that the MTP and the MTIP amendments conformed to Clean Air Act requirements. As a result of the conformity determination, the federal government approved funding for around fifty-nine transportation projects.

## II.

## THE COMPLAINT

In their complaint, plaintiffs aver that the SACOG underestimated projections of transportation-related ozone emissions when it drafted the Sacramento area's twenty-year metropolitan transit plan ("MTP") and three-year metropolitan transit improvement program ("MTIP") and that the DOT and Caltrans approved these plans based on these unrealistic projections in violation of the conformity requirement of the Clean Air Act. *See* 42 U.S.C. § 7506(c)(1).

Essentially, plaintiffs allege that defendants relied upon inaccurate estimates of $NO_x$[5] reductions due to their overestimation of the effectiveness of California's Bureau of Automotive Repairs Enhanced Vehicle Inspection and Maintenance program ("I/M program"). Plaintiffs contend that the ozone reduction attributable to the I/M program is based upon 1994 estimates which have not been updated and do not

---

4. 42 U.S.C. § 7506(c) provides:

(1) No department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of this title. No metropolitan planning organization designated under section 134 of Title 23, shall give its approval to any project, program, or plan which does not conform to an implementation plan approved or promulgated under section 7410 of this title. The assurance of conformity to such an implementation plan shall be an affirmative responsibility of the head of such department, agency, or instrumentality. Conformity to an implementation plan means—

(A) conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards and

achieving expeditious attainment of such standards; and

(B) that such activities will not—

(i) cause or contribute to any new violation of any standard in any area;

(ii) increase the frequency or severity of any existing violation of any standard in any area; or

(iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.

The determination of conformity shall be based on the most recent estimates of emissions, and such estimates shall be determined from the most recent population, employment, travel and congestion estimates as determined by the metropolitan planning organization or other agency authorized to make such estimates.

5. Nitrous oxide is emitted by motor vehicles and when combined with volatile or organic compounds and heat and sunlight it forms ozone.

accurately reflect the effectiveness of the I/M program. The shortfalls are attributable to several sources including underestimates of current vehicle "cutpoints" for NOx, an overestimate of fail rates, the failure of vehicle owners to show up at test-only centers, and legislative changes exempting vehicles up to four years old and predating 1973 from the I/M program. Plaintiffs aver that despite a reduction in the overall impact of the I/M program, the MTP and MTIP continue to project large reductions in NOx emissions based on the 1994 estimates. *See* First Amended Compl. at ¶¶ 32–34.[6] As a result, the current MTP and MTIP significantly exceed the level of NOx emissions contained in California's state implementation plan ("SIP"). *See id.* at ¶ 36.

Although less than pellucid, it appears that plaintiffs advance three causes of action under the citizen suit provision of the Clean Air Act, *see* 42 U.S.C. § 7604(a) and one under the Administrative Procedures Act, 5 U.S.C. § 702 *et seq.*, which seek to enjoin the DOT from funding a specific number of the around fifty-nine transportation projects contained in the allegedly non-conforming MTP and MTIP.

Additionally, plaintiffs sue under the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* alleging that the environmental impact statements attendant to the funding of the transportation projects contained in the MTP and MTIP were inadequate by virtue of the reliance on the out-of-date information concerning ozone levels.

### III.

### MOTION TO DISMISS

Defendants move to dismiss plaintiffs' claims under the citizen suit provision of

the CAA and under the National Environmental Policy Act. I address their arguments below.

### A. STANDARDS

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL—CIO v. Schermerhorn*, 373 U.S. 746, 753 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963). Thus, the plaintiff need not necessarily plead a particular fact if that fact is a reasonable inference from facts properly alleged. *See id.; see also Wheeldin v. Wheeler*, 373 U.S. 647, 648, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963) (inferring fact from allegations of complaint).

In general, the complaint is construed favorably to the pleader. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). So construed, the court may not dismiss the complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him or her to relief. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In spite of the deference the court is bound to pay to the plaintiff's allegations, however, it is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not alleged, or that the defendants have violated the … laws in ways that have not been alleged." *Associ-*

---

6. Specifically, plaintiffs aver that the MTIP estimates a reduction of 5.24 tons per day of NOx emissions.

ated *General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

## B. CITIZEN SUIT PROVISION OF THE CLEAN AIR ACT

The Clean Air Act explicitly provides a private cause of action for "any person" who alleges that defendants have violated or are in violation of an "emission standard or limitation under this chapter," 42 U.S.C. § 7604(a),[7] including "a requirement established by the State or the Administrator [of the Environmental Protection Agency] which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis." 42 U.S.C. § 7602(k).[8] An emission standard or limitation also includes a "standard of performance," 42 U.S.C. § 7604(f)(1), which is defined as "a requirement of continuous emission reduction...." 42 U.S.C. § 7602(1).[9]

Plaintiffs maintain that their suit alleges violations of both types and thus is actionable under the Clean Air Act.[10] In essence, they argue that the conformity determination itself is an emission standard or limitation and that defendants' failure to con-

duct a proper one violates the Clean Air Act. Plaintiffs rely upon two California district court decisions, *City of South Pasadena v. Slater,* 56 F.Supp.2d 1106 (C.D.Cal.1999) and *Citizens for a Better Environment v. Deukmejian,* No. 89–2044, 1990 WL 127525 (N.D.Cal. May 7, 1990), in an effort to demonstrate that such claims are cognizable under the citizen suit provision. Plaintiffs' reliance is misplaced.

In *Citizens for a Better Environment,* the court found that the plaintiffs had standing to sue the Metropolitan Transportation Commission for failure to conduct a conformity assessment required by the Bay Area Air Quality Plan. No. 89–2044, 1990 WL 127525 at *1. In doing so, the court cited to the citizen provision of the Clean Air Act as establishing a private cause of action to enforce "any condition or requirement of a state implementation plan relating to ... transportation control measures." *Id.* (quoting 42 U.S.C. § 7604(f)(3)) (internal quotation marks omitted). The defendants in that case did not dispute that the conformity assessment was a part of California's state implementation plan. *See id.* at *5 fn. 4. In this case, however, the defendants argue that

---

7.  The statute in pertinent part provides:

    ... any person may commence a civil action on his own behalf—

    (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation....

8.  The statute provides:

    (k) The terms "emission limitation" and "emission standard" mean a requirement established by the State or the Administrator which limits the quantity, rate, or con-

centration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice or operational standard promulgated under this chapter.

9.  The statute provides:

    (1) The term "standard of performance" means a requirement of continuous emission reduction, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction.

10. The Clean Air Act includes additional definitions of the phrase "emission standard or limitation under this chapter," *see* 42 U.S.C. § 7604(f), however, plaintiffs do not contend that any of them are applicable.

the conformity determination is not a requirement of the SIP but a condition created by Congress. *See* 42 U.S.C. § 7506(c).[11]

Plaintiffs reliance on *City of South Pasadena* appears ill-founded. There, plaintiffs challenged the construction of a freeway extension on the grounds that, *inter alia*, it came from a nonconforming transportation improvement plan and that the defendants had miscalculated the emission attributable to the freeway extension. 56 F.Supp.2d at 1135. The court, however, analyzed the challenge under the standards of the Administrative Procedures Act, 5 U.S.C. § 702 *et seq.* and noted that it would "reverse an agency's decision where it is contrary to procedures required by law or where it is arbitrary or capricious." 56 F.Supp.2d at 1135 (citing *Oregon Natural Resources Council v. Marsh*, 52 F.3d 1485, 1488 (9th Cir.1995) (citing 5 U.S.C. § 706(2)(D))). Rather than supporting plaintiff's position, *City of South Pasadena*, properly read, castes doubt upon it.

It well established that challenges to agency determinations falling under the general provisions of the Clean Air Act are properly analyzed under the APA rather than the citizen suit provision of the Clean Air Act. *See Conservation Law Foundation v. Busey*, ("*Busey*") 79 F.3d 1250, 1260 (1st Cir.1996) ("[C]onformity provision itself imposes no ... standards or requirements [which would expose it to

challenge under the citizen suit provision]. It simply imposes a duty on federal agencies not to approve or support any activity that does not meet the standards set out in a SIP or the CAA."); *Delaney v. EPA*, 898 F.2d 687, 689 (9th Cir.1990) (challenge to EPA's approval of a state implementation plan analyzed under the APA's arbitrary and capricious standard); *Cf. League to Save Lake Tahoe, Inc. v. Trounday*, 598 F.2d 1164, 1168–70, 1173 (9th Cir.1979) (citizen suit provision only applies to suits against individual or governmental polluters and not in actions seeking to enforce compliance on government agencies to the general obligations under the Clean Air Act);[12] *but see Conservation Law Foundation v. Federal Highway Administration*, ("*CLF*") 24 F.3d 1465, 1477 (1st Cir. 1994) ("The conformity requirements plainly constitute an emissions standard of performance....") (internal quotation marks and citation omitted).

Although the *Delaney* court did not explicitly hold that a private cause of action under the Clean Air Act was unavailable, its silence on the issue is instructive. Had the Clean Air Act's citizen suit provision been available to the plaintiffs in *Delaney*, they would not have been permitted to seek review under the APA. *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review under the APA."); *Oregon Natural Resources*

---

**11.** Plaintiffs have not alleged that the determination is anything but a statutory requirement. In their opposition to the motion to dismiss, however, plaintiffs broadly assert that, "the conformity determination is a requirement established by the state[.]" Pls.' Opp. to Mot. to Dismiss at 4. They offer no authority to support this assertion, nor does it appear that they are correct. The conformity requirement is embodied in the Clean Air Act itself, *see* 42 U.S.C. § 7506(c), and does not originate in California's SIP.

**12.** In *Trounday*, the plaintiffs challenged the procedures employed in the issuance of construction registration certificates to two hotels in the Tahoe Basin. The court analyzed their allegations under the citizen suit provision of the Clean Air Act rather than the APA because the applicable SIP specifically provided for the issuance of the challenged registration certificates. 598 F.2d at 1167.

*Council v. U.S. Forest Service*, 834 F.2d 842, 851 (9th Cir.1987) (citizens may not circumvent the requirements of the citizen suit provision by resorting to the APA).

■■■ It may be true that the defendants' reliance on faulty ozone level estimates will ultimately result in violating the emissions levels set in California's SIP and may prevent the Sacramento area from meeting its requirement of continuous emission reduction of ozone. Prospective violations of the Clean Air Act, however, are not cognizable through the citizen suit provision which creates a cause of action only to address past or current violations of emissions standards and limitations. *See* 42 U.S.C. § 7604(a)(1) ("[C]ognizable defendants under the CAA include any person ... alleged to have violated ... or to be in violation of ... an emission standard or limitation.") Therefore, I concluded that plaintiffs' challenge must proceed under the APA and not 42 U.S.C. § 7604.

## C. NATIONAL ENVIRONMENTAL POLICY ACT

Next, the federal defendants move to dismiss plaintiffs' fifth count under the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* Below, I conclude that dismissal is not appropriate.

In their complaint, plaintiffs aver that the defendants failed to submit adequate environmental impact statements ("EIS") attendant to the funding of the challenged transportation projects in violation of the NEPA. *See* 42 U.S.C. § 4332(2)(C). Defendants contend that plaintiffs have failed to allege facts sufficient to determine which, if any, of the subject highway projects constitute "major federal actions" which require an environmental impact statement under NEPA.

■■■ NEPA mandates that all federal agencies prepare an environmental impact statement on every proposal for legislation any other major federal action that signifi-

cantly effect the environment. *See* 42 U.S.C. § 4332(2)(C). Although the plaintiffs do not explicitly aver facts that each of the challenged highway projects are "major federal actions," they do allege that defendants fall under the NEPA's EIS requirement, and so it is reasonable to infer that the challenged projects amount to "major federal actions." *See Retail Clerks Intern. Ass'n Local 1625*, 373 U.S. at 753 n. 6, 83 S.Ct. 1461 (the court is bound to give the plaintiff every reasonable inference).

## IV.

## SUMMARY JUDGMENT

Before the court heard oral arguments on defendants' motion to dismiss, plaintiffs moved for summary judgment. I address this motion based on the analysis below.

### A. STANDARDS

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *See also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Sicor Limited v. Cetus Corp.*, 51 F.3d 848, 853 (9th Cir.1995).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will bear

the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322, 106 S.Ct. 2548. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. 2548.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *See also First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Sicor Limited*, 51 F.3d at 853.

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed.R.Civ.P. 56(e); *Matsushita*, 475 U.S. at 586 n. 11, 106 S.Ct. 1348; *See also First Nat'l Bank*, 391 U.S. at 289, 88 S.Ct. 1575; *Rand v. Rowland*, 154 F.3d 952, 954 (9th Cir.1998). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might

affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Owens v. Local No. 169, Assoc. of Western Pulp and Paper Workers*, 971 F.2d 347, 355 (9th Cir.1992) (quoting *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987)), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *See also Cline v. Industrial Maintenance Engineering & Contracting Co.*, 200 F.3d 1223, 1228 (9th Cir.2000).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank*, 391 U.S. at 290, 88 S.Ct. 1575; *See also T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments); *See also International Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir.1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); *See also In re Citric Acid Litigation*, 191 F.3d 1090, 1093 (9th Cir.1999). The evidence of the opposing party is to be believed, *see Anderson*, 477 U.S. at 255, 106 S.Ct. 2505, and all reasonable inferences that may be drawn

from the facts placed before the court must be drawn in favor of the opposing party, *see Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (*per curiam*)); *See also Headwaters Forest Defense v. County of Humboldt*, 211 F.3d 1121, 1132 (9th Cir.2000). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd*, 810 F.2d 898, 902 (9th Cir.1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).

## B. ANALYSIS

The major thrust of the motion for summary judgment is that plaintiffs are entitled to summary judgment under the citizen suit provision of the Clean Air Act. Because the court dismissed the citizen suit claims, I must deny the summary judgment motion predicated upon them.[13] Although the plaintiffs assert that even if the case proceeds under the APA they are entitled to relief, the motion was not supported with the administrative record. In light of the court's dismissal of the claims arising under the citizen suit provision, the court denies plaintiffs' summary judgment without prejudice. Once the court determines the content of the administrative record, the plaintiffs may again move for summary judgment.

## V.

## PRELIMINARY INJUNCTION

Plaintiffs also seek a preliminary injunction barring the defendants from funding several of the challenged transportation projects. I decide this motion based on the analysis below.

██ The purpose of the preliminary injunction as provided by Fed.R.Civ.P. 65 is to preserve the relative positions of the parties—the *status quo* —until a full trial on the merits can be conducted. *See Uni-*

---

**13.** It is far from clear that the plaintiffs would have met their summary judgment burden even under viable citizen suit claims due to their failure to submit admissible evidence.

It is well settled that only admissible evidence may be considered on a motion for summary judgment. *See Beyene v. Coleman Sec. Services, Inc.*, 854 F.2d 1179 (9th Cir. 1988) (citing Fed.R.Civ.P. 56(e)). Federal Rule of Evidence 901(a) requires "authentication or identification as a condition precedent to admissibility." Thus, before evidence may be submitted, a foundation must be laid "by evidence sufficient to support a finding that the matter in question is what the proponent claims." *Id.*

The plaintiffs, however, have failed to lay a proper foundation for several key documents upon which their argument rests. Specifical-

ly, plaintiffs failed to authenticate their evidence that the 1998/99 MTIP credited the I/M program with 5.24 tons per day ("tpd") downward adjustment for NOx emissions, *see* Pls.' Undisputed Fact No. 3, or that the vehicle cutpoints for NOx were higher than those estimated in the I/M control factors. *See* Pls.' Undisputed Fact No. 5.

Moreover, the plaintiffs failed to present any evidence to support their assertion that the current fail rates were lower than those estimated in the I/M control factors, *see* Pls.' Undisputed Fact No. 6, or that a significant percentage of vehicles required to visit test-only centers never show up. *See* Pls.' Undisputed Fact No. 7. Finally, plaintiffs do not support their contention that legislative changes made during 1997 were not accounted for in the conformity determination. *See* Pls.' Undisputed Fact No. 8.

versity of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). The limited record usually available on such motions renders a final decision on the merits inappropriate. *See Brown v. Chote,* 411 U.S. 452, 456, 93 S.Ct. 1732, 36 L.Ed.2d 420 (1973).

■■■ "The [Supreme] Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). In the Ninth Circuit, two interrelated tests exist for determining the propriety of the issuance of a preliminary injunction. The moving party carries the burden of proof on each element of either test. *See Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1203 (9th Cir.1980). Under the first "traditional" test, the court may not issue a preliminary injunction unless each of the following requirements is satisfied: (1) the moving party has demonstrated a likelihood of success on the merits, (2) the moving party will suffer irreparable injury and has no adequate remedy at law if injunctive relief is not granted, (3) in balancing the equities, the non-moving party will not be harmed more than the moving party is helped by the injunction, and (4) granting the injunction is in the public interest. *See Martin v. International Olympic Committee,* 740 F.2d 670, 674–75 (9th Cir. 1984).

Under the second "alternative" test, the court may not issue a preliminary injunction unless the moving party demonstrates either "probable success on the merits and irreparable injury ... or ... sufficiently serious questions going to the merits to make the case a fair ground for litigation and a balance of hardships tipping decidedly in favor of the party requesting relief." *Topanga Press Inc. v. City of Los Angeles,* 989 F.2d 1524, 1528 (9th Cir.1993) (citations omitted). The Ninth Circuit has explained that the two parts of the alternative test are not separate and unrelated, but are "extremes of a single continuum." *Benda v. Grand Lodge of International Association of Machinists,* 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). We are taught that the critical element within this alternative test is the relative hardship to the parties. *See id.* "[T]he required degree of irreparable harm increases as the probability of success decreases." *United States v. Nutricology Inc.,* 982 F.2d 394, 397 (9th Cir. 1992) (citations and internal quotation marks omitted). Even if the balance tips sharply in favor of the moving party, however, "it must be shown as an irreducible minimum that there is a fair chance of success on the merits." *International Olympic Committee,* 740 F.2d at 674–75. (citation omitted). I deny plaintiff motion based on the analysis below.

## A. LIKELIHOOD OF SUCCESS

■■■ Since the pending motion is for a preliminary injunction rather than a permanent one, plaintiffs must show "likelihood of success on the merits rather than actual success." *Sierra Club v. Penfold,* 857 F.2d 1307, 1318 (9th Cir.1988); *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 546, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Thus, this court's denial of the plaintiffs' summary judgment motion does not preclude success on the instant motion. However, the likelihood of the plaintiffs' success turns, in large .part, on their ability to produce evidence that the defendants disregarded the shortfalls of the I/M program and that as a result SACOG's MTIP did not conform. Plaintiffs' failure to support their assertions with admissible evidence, see n. 13, *supra,* castes serious doubt upon the likelihood of

their ability to ultimately prevail on their claim that defendants acted in an arbitrary or capricious manner when they made and subsequently approved the conformity determination. *See* 5 U.S.C. § 706(2)(D).

## B. BALANCE OF HARMS

Plaintiffs' claim of irreparable injury to the environment rests on their ability to demonstrate that the approved transportation projects will exceed the emissions budget set by California's SIP. Thus, their ability to demonstrate injury is contingent on their ability to demonstrate a violation of the Clean Air Act. As noted above, however, the plaintiffs have not demonstrated how the alleged shortfalls in the I/M program will ultimately affect the emissions budgets. Thus, they have failed to carry their burden in demonstrating irreparable harm. *See Nutri-cology Inc.,* 982 F.2d at 397. Plaintiffs' motion for a preliminary injunction must be denied.

## VI.

## MOTION TO AUGMENT THE ADMINISTRATIVE RECORD

The parties filed cross-motions to augment the administrative record. I decide these motions based on the analysis below.

Defendants move to supplement the administrative record to include an affidavit by Erik Steavens, a former transportation planning engineer with the FHWA, in which he explains why the FHWA approved the SACOG's conformity determination despite the innacuracy of the NOx reductions attributed to the I/M program. According to Mr. Steavens, Ken Hough of the SACOG, left him a phone message in which he indicated that he had spoken to Doug Thompson of the California Air Resources Board who had determined that any shortfall in NOx reductions attributed to the I/M program would be made up by

with NOx reductions from "other programs."

Agency actions are reviewed by examining the administrative record at the time the agency made its decision. *See Kunaknana v. Clark,* 742 F.2d 1145, 1149 (9th Cir.1984) (citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 419–420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). Generally, agency documents prepared during and in response to litigation are excluded from this review. *See id.*

"When there is such a failure to explain administrative action as to frustrate effective judicial review, the court may obtain from the agency, either through affidavits or testimony, such additional explanations of the reasons for the agency decision as may prove necessary." *Friends of the Earth v. Hintz,* 800 F.2d 822, 829 (9th Cir.1986) (quoting *Public Power Council v. Johnson,* 674 F.2d 791, 793–94 (9th Cir.1982)) (internal quotation marks omitted). Such information is to be used for the limited purposes of background information for ascertaining whether the agency considered all the relevant factors or fully explained it course of conduct or grounds for decision. *See Asarco, Inc. v. United States Environmental Protection Agency,* 616 F.2d 1153, 1160 (9th Cir.1980).

Such an inquiry into the mental processes of the administrative decisionmakers, however, is usually to be avoided. *See Overton Park,* 401 U.S. at 420, 91 S.Ct. 814 (citing *United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941)). The High Court has further cautioned that where there were administrative findings contemporaneous to the decision, there must be a showing of bad faith or improper behavior before such an inquiry may be made. *See id.* Since the parties have not proffered evidence suggesting bad faith, the motion must be denied.

The court notes, however, that even it if finds consideration of Mr. Steavens' affidavit to be warranted, there must support for the FHWA's determination within the administrative records itself. *See Asarco*, 616 F.2d at 1159–1160.

The plaintiffs also move to augment the administrative record to include several attachments to their July 2, 1999 comment letter.[14] Although the letter itself is included within the administrative record and refers to the omitted attachments, the attachments were not forwarded to the federal defendants. Martin Tuttle, the executive director of the SACOG does not dispute that this was due to an inadvertent error on the part of the SACOG. The federal defendants, nonetheless, maintain that inclusion of the attachments is improper as they never received them. I cannot agree.

The essence of the plaintiffs' case is that the federal defendants failed to consider relevant evidence demonstrating that the I/M program underperformed. To this end, plaintiffs provided defendants during the public comment period, several letters which laid out the specifics of their contention. The attachments supplemented their efforts by offering full, but not new, evidence of the I/M programs shortcomings. Despite, plaintiffs' efforts to document the failure of I/M program, the defendant failed to forward it, claiming it inadvertently misplaced some of their evidence. Nevertheless, defendants were provided an opportunity to consider plaintiffs' argument and evidence. To say the least, it seems anomalous to deprive plaintiffs of the benefit of their public comments because defendants misplaced it. Accordingly, I conclude that inclusion of the attachments within the administrative record is appropriate.

## VII.

## ORDERS

Accordingly, the court hereby makes the following orders:

1. Defendants' motion to dismiss plaintiffs' causes of action under the Clean Air Acts' citizen suit provision is GRANTED;

2. Defendants' motion to dismiss plaintiffs' cause of action under the NEPA is DENIED;

3. Plaintiffs' motions for summary judgment and preliminary injunction are DENIED;

4. Defendants' motion to augment the administrative record is DENIED;

5. Plaintiffs' motion to augment the administrative records is GRANTED; and

6. A Status Conference is now SET for December 4, 2000 at 10:15 a.m.

IT IS SO ORDERED.

---

**14.** Plaintiffs claim that these tables were attached to their June 28, 1999 comment letter. A review of the contents of that letter as well as the plaintiffs' July 2, 1999 comment letter reveal that the attachments were to the latter and not the former comment letter.